**RECEIVED**

SEP 0 1 2010

DOUGLAS E. ARPERT
U.S. MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Andre' Lewis

         Plaintiff(s)

       :

v.

P. Williams, et al.     :

         Defendant(s)

             :

Hon. ~~Garrett E. Brown~~ *JOEL A. PISANO*

Civil Action No. <u>07-1592</u>

**FINAL PRETRIAL ORDER**

      This matter having come before the Court for a pretrial conference pursuant to <u>Fed.R.Civ.P. 16</u>; <u>  Andre Lewis , pro se  </u> having appeared for plaintiff(s) and <u>Joseph M. Micheletti  Deputy Attorney General</u> having appeared for defendant(s); the following Final Pretrial Order is hereby entered:

1.      **JURISDICTION:** (Set forth specifically)

      This action is authorized and instituted pursuant to 42 U.S.C. § 1983. This Court has jurisdiction over claims presented pursuant to 28 U.S.C. §§ 1331, 1343(a)(1) and 1343(a)(3).

      ~~The parties agree and consent that this matter shall be tried before the Honorable Douglas E. Arpert, U.S.M.J.~~ 

2.      **PENDING/CONTEMPLATED MOTIONS:** (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or the calendar.  Also set forth the nature of the motion and return date.  If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position.)

Plaintiff:

A.      Motion to Extend Discovery. (Plaintiff adamantly contends that the defendants have not been complying with his requests for discovery, have been obstructing his ability to access the prison law library, and have been obstructing his ability to prosecute his civil action effectively.)

B.      Motion for Pre-Trial Conference. (Plaintiff believes he could much better convey his dilema, complaints of harassment and obstruction by defendants, and discovery issues if he could be granted oral audience with the attorney for the defendants and the presiding judge.)

**RECEIVED**

OCT 1 3 2010

AT 8:30_____M
WILLIAM T. WALSH
CLERK

C.    Motion for Leave to Serve Defendant Reagan with Copy of the Summons and
      Complaint. (Defendants and the New Jersey State Prison will not cooperate with the
      plaintiff or the United States Marshall's requests for the last known address of
      Defendant James Reagan, even though they know it. Defendants will not cooperate
      will the "Alias Summons" issued by Judge Garrett E. Brown to the United States
      Marshals to locate and serve Defendant James Reagan with a copy of the Summons
      and Complaint.)

D.    Motion for Court-Appointed Expert. (Plaintiff contends that the defendants and their
      cohorts have purposely and criminally tampered with and distorted the videotape
      evidence in this matter and the plaintiff will absolutely need an expert to examine,
      authenticate, and testify to the state of the evidence. )

E.    Motion for Court-Appointed Attorney. (Pro-se prisoner plaintiff is experiencing
      great difficulty in obtaining discovery that is imperative to giving him a real chance
      to seek justice against his assailants - the defendants - simply because he is a
      prisoner; has no ability to actually investigate his claims; and because the prison
      officials do not want to provide a prisoner with admissible evidence that they claim
      is security sensitive. Plaintiff also has great difficulty in adequately understanding the
      complex rules of discovery and the court.  Plaintiff contends that he cannot afford his
      own attorney and if forced to pursue this litigation without professional counsel will
      give the defendants an unfair advantage at trial, and subsequently deny the plaintiff
      due justice.)

F.    Motion In Limine to Exclude Testimony about the Crime for which the Plaintiff is
      currently incarcerated, as it has absolutely no relevance to the events of 29 March,
      2005 and 2 August, 2005 that Caused this Civil Action to be Brought.

G.    Motion to Compel Production of Documents. (Defendants will not cooperate with
      plaintiff's requests for records, prison memorandums, prison log books and journals,
      disciplinary personnel records, prison policy manuals, etc.)

H.    Motion for Leave to Submit Interrogatories and Requests for Admissions to the
      Defendants. (Despite the fact that the defendants told Judge Arpert that discovery
      was completed in this matter.. .discovery has not been completed.)

I.    Motion In Limine to Preclude Defendants from Offering any Testimony or Evidence
      in Their Defense with Regard to the Videotape Evidence that They Have
      Intentionally Altered and Tampered with to Falsify Evidence, Shield their Criminal
      Activity and Obstruct Justice.

2

J.   Motion for Judicial Order Enforcing Plaintiff's Constitutional Right to Access to the Court and the Prison's Law Library.

K.   Motion for Injunction to Restrain the New Jersey Department of Corrections from Further Acts of Lawlessness, Harassment, Obstruction, and Retaliation Against the Plaintiff.

Defendants:

A.   Defendants contemplate filing a Motion in Limine , pursuant to FRE 401, FRE 402, FRE 403 and FRE 404, to exclude testimony regarding the prior disciplinary records, arrest records, or records of other litigation, if any, of any defendant. Return date to be set by court.

B.   Defendants contemplate filing a Motion in Limine, pursuant to FRE 701 and FRE 702, to exclude any lay opinion testimony seeking to establish the existence, permanence or cause of any purported physical and psychological injuries alleged in plaintiff's complaint. Return date to be set by court.

3.   **STIPULATION OF FACTS**: (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties.)

A.   Plaintiff, Andre' Lewis, was a prisoner confined to the Administrative Segregation and Detention Units of the New Jersey State Prison at all times relevant to Plaintiff's Complaints.

B.   Plaintiff was summoned from his cell at approximately 6:45 am by Defendants Paul Williams, Lazaro Viton, and James Reagan to be escorted to the clinic to receive his morning insulin injection.

C.   Plaintiff was strip searched, by Defendants Paul Williams, James Reagan, and Lazaro Viton, prior to leaving the cell area.

D.   Plaintiff complied with all orders given during the strip-search, and completed the strip-search procedure without incident.

E.   Plaintiff was ordered to get dressed and was then handcuffed through a slot in the iron-bar security gate that separated him from Defendants Williams, Reagan, and Viton in the front of his body to a leather waistbelt restraint device.

3

F.      An altercation between Plaintiff and defendants ensued.

G.      Based on the altercation a code 33 (fighting code) was sounded and other officers responded to the Administrative Segregation Unit.

H.      Defendant Alaimo also responded to the code.

I.      Thereafter Plaintiff was placed in leg shackles by corrections officers.

J.      Plaintiff was taken to the clinic handcuffed to a leather waist-belt restraint device and leg shackles by Defendant Alaimo and other corrections officers.

K.      Plaintiff was seen by medical staff after the altercation to evaluate whether he had suffered any injuries.

L.      Plaintiff was taken by ambulance to Saint Francis Medical Center's Emergency Room to receive medical care for his injuries.

M.      Defendant Williams was employed as a Senior Corrections Officer for the New Jersey Department of Corrections at the New Jersey State Prison and was assigned to the Administrative Segregation Unit during the time period alleged in Plaintiff's Complaint.

N.      On March 29, 2005, Defendants Williams and Alaimo issued three disciplinary charges to Plaintiff for spitting on defendants, assaulting them, and engaging in conduct that disrupted the orderly running of the facility.

O.      On April 18, 2005, Plaintiff Andre' Lewis attended a Courtline Hearing regarding the charges that Defendant Paul Williams had issued against him on March 29, 2005.

P.      At the disciplinary proceeding the hearing officer concluded that Plaintiff was guilty of "spitting on" Defendant Williams and the remaining charges were dismissed as being redundant.

Q.      Defendant, James Reagan, was employed as a Corrections Officer Recruit with the New Jersey Department of Corrections at the time alleged in Plaintiff's Complaints.

R.      Defendant, James Reagan, was present on March 29, 2005 at the time of the incident alleged in Plaintiff's Complaint.

T.      Defendant, Lazaro Viton, was employed as a Corrections Officer Recruit with the New Jersey Department of Corrections at the New Jersey State Prison during the time

alleged in Plaintiff's Complaints.

U.    Defendant, Lazaro Viton, was present on March 29, 2005 at the time of the incident alleged in Plaintiff's Complaint.

V.    Defendant Stephen Alaimo was employed as a Sergeant Corrections Officer with the New Jersey Department of Corrections at the New Jersey State Prison during the time alleged in Plaintiff's Complaints.

W.    Defendant Stephen Alaimo responded to the code 33 (fighting code) that was sounded on March 29, 2005 at the time of the incident alleged in Plaintiff's Complaint.

X.    Plaintiff was a prisoner confined to housed at #54 of the One Left Detention Unit of the New Jersey State Prison on 7 August, 2005.

Y.    On August 7, 2005 Plaintiff was escorted to the clinic to receive an insulin injection.

Z.    On that date, Plaintiff was involved in another incident with officers Lazaro Viton, Guiseppe Mandara, Gregory Carbonaro, D'Amore, James Liik, Sr., P. Lampitt, Anthony Degner, and Stephen Alaimo.

AA.   After the incident, Plaintiff was seen by medical staff to determine if he had suffered any injuries.

BB.   On that date Plaintiff was transported to Saint Francis Medical Center to receive medical treatment for his injuries.

CC.   On 8 August, 2005, Plaintiff was issued numerous disciplinary charges for assault, throwing bodily fluids, threatening, and conduct which disrupts the orderly running of the institution.

DD.   On 19 August, 2005, Plaintiff Andre' Lewis was found not guilty of the four assault charges and was found guilty of throwing bodily fluid, threatening, and conduct which disrupts the orderly running of the institution.

EE.   Defendant, Guiseppe Mandara, was employed as a Corrections Officer Recruits with the New Jersey Department of Corrections at the New Jersey State Prison during the time alleged in Plaintiff's Complaints.

FF.   Defendant James Liik, Sr. was employed as a Corrections Officer Recruit with the New Jersey Department of Corrections at the New Jersey State Prison at the times

5

alleged in Plaintiff's Complaint.

GG.     Defendant, Gregory Carbonaro, was employed as a Senior Corrections Officer with the Department of Corrections at the New Jersey State Prison during the time alleged in Plaintiff's Complaint.

HH.     Defendant Anthony Degner was employed as a corrections officer with the New Jersey Department of Corrections at the New Jersey State Prison during the time alleged in Plaintiff's Complaint.

II.     Defendant, D'Amore, was employed as a Corrections Officer with the New Jersey Department of Corrections at the New Jersey State Prison during the time alleged in Plaintiff's Complaint..

JJ.     Defendant, P. Lampitt, was employed as a Sergeant with the Department of Corrections at the New Jersey State Prison during the time alleged in Plaintiff's Complaint.

KK.     Defendant, Ronald Cathel, was employed with the New Jersey Department of Corrections as the Administrator of the New Jersey State Prison during the time alleged in Plaintiff's Complaints.

LL.     Defendant, Devon Brown, was employed with the New Jersey Department of Corrections as the Commissioner of the New Jersey Department of Corrections during the time alleged in Plaintiff's Complaints.

4.     **PLAINTIFF'S CONTESTED FACTS:** (Stated separately for each defendant. Proof shall be limited at trial to the matters set forth below.  Failure to set forth any matter shall be deemed a waiver thereof.)

A. Plaintiff intends to prove the following contested facts with regard to liability:

1.     Between March 11, 2005 and March 29, 2005, Plaintiff did file numerous oral and written grievances against Defendant Williams with the supervisory custody personnel of the New Jersey State Prison, the Administration of the New Jersey State Prison, and the office of the Ombudsman for misconduct, harassment, and threatening him.

2.     On March 29, 2005, Defendant Williams did interfere with the medical escort of Plaintiff to receive an insulin injection, against the New Jersey State Prison's policies governing such activities.

3. On March 29, 2005, Defendant Williams, did conspire with Defendants Reagan and Viton to orchestrate a planned physical assault on Plaintiff while he was handcuffed to a leather waist-belt restraint device and unable to defend himself, in retaliation for Plaintiff filing numerous complaints and grievances with the Administration of the New Jersey State Prison and the Office of the Ombudsman against Defendant Williams.

4. On March 29, 2005, Defendant Williams, did, without cause or provocation, assault Plaintiff by punching in his face, while Defendants James and Viton were holding and restraining Plaintiff, and while Plaintiff was handcuffed to a leather waist-belt restraint device and defenseless.

5. On March 29, 2005, Defendant Williams, Reagan, and Viton did purposely assault Plaintiff with the intent to cause him serious bodily injury, to punish him for filing complaints against corrections officers, and to terrorize him into never filing complaints against corrections officers in the future.

6. On March 29, 2005, Defendant Williams did, while assaulting Plaintiff , while Plaintiff was handcuffed to a leather waist-belt restraint device, repeatedly utter the fact that he had planned the assault on Plaintiff.

7. On March 29, 2005, Defendant Williams did file false disciplinary charges against Plaintiff alleging that Plaintiff assaulted him, without cause, by spitting on him, bumping him, and kicking him in order to cover-up and justify his orchestrated and planned attack on Plaintiff.

8. On March 29, 2005, Defendants Reagan, Viton, and Alaimo did conspire with Defendant Williams to file false supplemental reports relative to the events of March 29, 2005, that caused this civil action to be brought, in order to assist Defendant Williams in his retaliatory and planned attack against Plaintiff and to contrive the illusion that the assault they perpetrated against Plaintiff was justified acted out in "good-faith".

9. Plaintiff will prove that at no time during the events of March 29, 2005, that caused this civil action to be brought, was he uncooperative or non-compliant with Defendants Williams, Reagan, or Viton, prior to Defendant Williams punching him in the face, without cause or provocation, while he was handcuffed to a leather waist-belt restraint device and held by Defendants Reagan and Viton.

10. Plaintiff will prove that at no time during the events of March 29, 2005, that caused this civil action to be brought did he refuse any orders from Defendants Williams, Reagan or Viton.

7

11.    Plaintiff will prove that at no time during the events of March 29, 2005, that caused this civil action to be brought, did he refuse any orders from Defendants Williams, Reagan, and Viton and that at no time during those events did he ever spit on Defendant Williams, bump into Defendant Paul, or assault Defendant Williams.

12.    On March 29, 2005, Defendants Williams, Reagan, Viton, and Alaimo and other corrections officers responding to a code 33 (fight) alarm relative to the assault on Plaintiff did use excessive physical force against Plaintiff and intentionally apply leg-shackles to his lower extremities in a manner that caused Plaintiff unnecessary and excruciating pain, suffering, and serious physical injury and permanent scarring to his legs.

13.    On March 29, 2005, Defendant Alaimo did, along with two other corrections officers under his supervision, escort Plaintiff from the Administrative Segregation Unit of New Jersey State Prison to the prison's clinic, subsequent to responding to the code 33 (fight) alarm that was sounded relative to the assault on Plaintiff while he was at all times handcuffed to a leather waist-belt restraint device.

14.    On March 29, 2005, Defendant Alaimo did, with two other corrections officers take plaintiff into a corridor in the North Coumpound of the New Jersey State Prison that has no video camera surveillance equipment and is known as a "Dead Zone" because this area is unmonitored and can be utilized to commit assaults and other lawless acts without the offenses being captured on a recording device or witnessed by unwanted by-standers.

15.    On March 29 , 2005, Defendant Alaimo did, while in an unsurveilled corridor in the North Compound of the New Jersey State Prison, threaten to inflict serious bodily harm upon Plaintiff and "kill him" for "fucking with his guys."

16.    On March 29, 2005, Defendant Alaimo did, while in an unsurveilled corridor in the North Compound of the New Jersey State Prison, repeatedly strike Plaintiff about the face and head, without cause or provocation, while Plaintiff was handcuffed to a leather waist-belt restraint device, clasped in leg-shackles, and at all times restrained by two other corrections officers.

17.    On March 29, 2005, Plaintiff was transported from the New Jersey State Prison to the Saint Francis Medical Center's Emergency Room, by ambulance, to receive emergent medical treatment for the serious injuries that he received as a result of the excessive physical force that Defendants Williams, Reagan, Viton, and Alaimo exerted upon him on March 29, 2005 in the orchestrated retaliatory assault that was perpetrated against him while he was at all times during those events handcuffed to a leather

waist-belt restraint device, restrained by multiple corrections officers, and in leg-shackles.

18. On March 29, 2005, Defendants Williams, Reagan, Viton, and Alaimo did violate Plaintiff First Amendment Right under the United States Constitution by effecting lawless acts upon him in an attempt to terrorize and deter him from filing grievances and complaints against corrections officers and about the conditions of his confinement.

19. On March 29, 2005, Defendants Williams, Reagan, Viton, and Alaimo did violate Plaintiff Eighth Amendment Rights under the United States Constitution by intentionally exerting unnecessary and excessive physical force upon Plaintiff while he was handcuffed to a leather waist-belt retraint device, in leg-shackles, and physically restrained by multiple corrections officers, because Plaintiff was filing complaints and grievances against corrections officers, thereby violating his constitutional right not to be subjected to cruel and unusual punishment.

20. On March 29, 2005, Defendants Williams, Reagan, Viton, and Alaimo did commit criminal offenses and tortious acts against Plaintiff by intentionally assaulting him while he was handcuffed to a leather waist-belt restraint device, in leg-shackles, and restrained by multiple corrections officers in violation of the laws of the State of New Jersey.

21. Between the dates March 29, 2005, through August 7, 2005, Plaintiff filed numerous grievances and complaints with the Administration of the New Jersey State Prison, the Office of the Ombudsman, and the Office of the Commissioner of the New Jersey Department of Corrections informing them that he had been assaulted while handcuffed and shackled by Defendants Williams, Reagan, Viton, and Alaimo in a planned retaliatory attack designed against him to cause him significant bodily harm, to terrorize him, and to punish him for filing grievances and complaints against corrections officers.

22. Between the dates March 29, 2005 through August 7, 2005, Plaintiff, his benefactors, and family notified the Administration of the New Jersey State Prison (Defendant Cathel) and the Office of the Commissioner (Defendant Brown) that he was being repeatedly and routinely threatened, abused, and violated by way of denial of his state, ci vil, constitutional, and human rights by several members of the custody personnel of the New Jersey State Prison - including Defendants Alaimo, Williams and Degner - because Plaintiff had filed numerous complaints against several corrections officers, filed grievances about the conditions of confinement at New Jersey State Prison, and because he was preparing to file litigation relative to the events of March 29, 2005.

23.   On August 7, 2005, Defendants Viton and Mandara did report to the One Left Detention Unit of New Jersey State Prison to escort Plaintiff to the clinic to receive an insulin injection and did communicate with him in a hostile and aggressive manner.

24.   On August 5, 2005, Defendants Viton and Handara were repeatedly asked by Plaintiff to summon an area supervisor because Plaintiff did not feel safe with Defendant Viton escorting him while he was in restraints or under any other means, as Defendant Viton had been a key party to the planned retaliatory assault on him during the events of 29 March, 2005 that caused this civil action to be brought and because Plaintiff was in the process of pursuing criminal prosecution of and civil litigation against Defendant Viton.

25.   On August 7, 2005, Defendants Viton and Mandara refused to summon an area supervisor, as requested to do by Plaintiff.

26.    In addition to this, Defendant Viton told Plaintiff that he was not going to see a supervisor and that Plaintiff could die in there (Plaintiff's cell) for all he cared.

27.   On August 7, 2005, Plaintiff, needing his insulin injection and realizing that Defendants Viton and Mandara were not going to summon the Area Supervisor, submitted to being escorted by Defendants Viton and Mandara to receive his insulin injection and complied with a strip-search conducted by Defendants Viton and Mandara prior to his escort without incident.

28.   On August 7, 2005, Defendants Viton and Mandara told Plaintiff that Defendant Cathel had changed the handcuffing policy for escorting prisoners confined to the Administrative Segregation and Detention Units and that, as per Defendant Cathel's orders, Plaintiff was to now be handcuffed with his hands behind his back in metal handcuffs, instead of being handcuffed to a leather waist-belt restraint device, and ordered Plaintiff to turn around to be handcuffed behind his back through the bars of his cell.

29.   On August 7, 2005, Plaintiff requested again that Defendants Viton and Mandara summon the Area Supervisor or produce a memorandum from Defendant Cathel stating that he was to be handcuffed behind his back in metal handcuffs, as this procedure was absolutely contrary to the routine and established policy that all prisoners confined to the Administrative Segregation and Detention Units be handcuffed in front of their bodies to a leather waist-belt restraint device while under escort.

30.   On August 7, 2005, Defendants Viton and Mandara refused to summon an Area

10

Supervisor or provide Plaintiff the memorandum that they claimed Defendant Cathel issued changing the handcuffing policy for prisoners under escort from the Administrative Segregation and Detention Units, as requested by Plaintiff.

31. On August 7, 2005, Defendants Viton and Mandara ordered Plaintiff to turn around, place his hands behind his back, and allow them to apply metal handcuffs to his wrists or he would not be escorted to receive his insulin injection.

32. Plaintiff complied with the order to be handcuffed behind his back with metal handcuffs and, once secured in the handcuffs, was roughly extracted from the cell by Defendants Viton and Mandara.

33. While escorting Plaintiff from the second tier of the One Left Detention Unit to receive an insulin injection, Defendants Viton and Mandara verbally accosted and taunted Plaintiff.

34. While escorting Plaintiff to receive his insulin injection, Defendants Viton and Mandara refused to guide or assist Plaintiff down a narrow and deep staircase on the One Left Detention Unit, though Plaintiff was handcuffed behind his back and unable to utilize his hands to guide himself down the staircase, contrary to the escort policies of New Jersey State Prison.

35. Defendants Viton and Mandara did taunt, threaten, shove, and prod Plaintiff with a baton as he attempted to descend the One Left Detention Unit's staircase while he was handcuffed behind his back and unable to utilize his hands to guide himself, navigate himself, or defend himself, in an attempt to cause him to tumble down the staircase.

36. Defendants Viton and Mandara did, while escorting Plaintiff to receive an insulin injection, hold him stationary at a security gate leading from the Administrative Segregation and Detention Units to the Rotunda Area of the New Jersey State Prison, while Defendant Degner stood on the opposite side of the security gate in front of Plaintiff taunting him and threatening him by informing Plaintiff that he, Defendants Alaimo and Williams, and other corrections officers were going to cause him bodily harm and commit other unlawful acts upon him when he eventually returned to the Administrative Segregation Unit from the One Left Detention Unit because Plaintiff had been filing grievances and complaints against corrections officers.

37. Plaintiff had refused several orders to move to the Administrative Segregation Unit from the deplorable conditions of confinement in the One Left Detention Unit because he had been threatened many times by Defendants Alaimo, Degner, Williams, and others since May 2005 that he would be "fucked up" or killed when

11

he "stopped hiding in One Left like a coward" and returned to the Administrative Segregation Unit because he was filing grievances and complaints against corrections officers.

38.   Plaintiff received numerous disciplinary charges between May 2005 through September 14, 2005, the date that he was transferred from the New Jersey State Prison to the Northern State Prison, for refusing to move from the One Left Detention Unit to the Administrative Segregation Unit.

39.   Defendants Viton and Mandara clearly heard Defendant Degner taunting and threatening Plaintiff and never ordered Defendant Degner to step away from Plaintiff or not to interfere with their escort, contrary to the escort policies of the New Jersey State Prison.

40.   Defendants Viton and Mandara, upon escorting Plaintiff through the security gate leading from the Administrative Segregation and Detention Units, did not order Defendant Degner to move away from their escort or to cease taunting and threatening Plaintiff, but instead walked Plaintiff past Defendant Degner and joined Defendant Degner in taunting and threatening Plaintiff by referring to him as a "nigger" and telling him that they were going to kill him.

41.   Upon entering into the Rotunda area, in the escort of Defendants Viton and Mandara, Plaintiff Andre Lewis made utterances to Defendants Degner, Viton, and Nandara that they were not going to kill him and that they were calling him a "nigger".

42.   Plaintiff attempted to alert the "Star Sergeant" or Area Supervisor of the Rotunda Area and other corrections officers posted in the Rotunda that Defendants Degner, Viton, and Mandara were referring to him as "nigger" and threatening to kil him, by uttering these facts out loud in the general direction of the "Star Sergeant's" podium and in the direction of the other corrections officers posted in the Rotunda Area.

43   Defendants Degner, Viton, and Mandara, noticing that Plaintiff was alerting other corrections officers in the Rotunda Area of the fact that they were calling him "nigger" and threatening to kill him, told Plaintiff to shut up and Defendants Viton and Mandara began using unnecessary physical force upon Plaintiff by shoving him and using batons to twist and wring his arms, which were handcuffed behind him in metal handcuffs, causing the handcuffs to cut into his wrists and cause extreme pain, discomfort, and cuts.

44.   Defendant Anthony Degner then uttered to Defendant Viton and Mandara "Say he kicked me", coercing Defendants Viton and Mandara into making a knowingly false statement that once received by their comrade corrections officers in the Rotunda

12

Area would create a hazardous condition, would justify the physical force that Defendants Viton and Handara were effecting upon Plaintiff, and would cause the other corrections officers posted in the Rotunda Area to respond to the false allegation and use additional physical force against Plaintiff.

45.   Defendants Viton and Mandara then made the false utterance that Plaintiff had kicked an officer, as they had been instructed to do by Defendant Degner, and began using greater physical force upon Plaintiff, who was non-resistant and handcuffed behind his back in metal handcuffs.

46.   Upon hearing the false utterances made by Defendants Degner, Viton, and Mandara, and seeing Defendants Viton and Guiseppe using physical force upon Plaintiff, several corrections officers - including Defendants Carbonaro, Liik, Sr., D'Amore, Degner and P. Lampitt - posted in the Rotunda Area converged on Plaintiff and began using extreme physical force upon Plaintiff by striking him with batons, punching him, kicking him, twisting his handcuffed arms with batons, and slamming him face-first against the wall of the "Star Booth" all while Plaintiff was handcuffed behind his back in metal handcuffs.

47.   While having unnecessary physical force exerted upon him and being restrained by multiple corrections officers face-first against the wall of the "Star Booth", Plaintiff was uttering out loud and directly to Defendant Lampitt - the "Star Sergeant" supervising the Rotunda Area - that he had done nothing, that Defendants Viton, Handara, and Degner had threatened his life and called him "nigger", and that Defendants Degner, Viton, and Mandara were conspiring against him by making false allegations that he had kicked an officer in order to justify using force against him and file false disciplinary charges against him.

48.   Plaintiff Andre' Lewis was non-resistant, subdued, and "pinned" face-first against the wall of the "Star Booth" by multiple corrections officers - including Defendants Viton, Mandara, D' Amore, Degner, Liik, Sr., and Carbonaro - when Defendants Viton, Mandara, and Degner made a knowingly false statement to Defendant Lampitt that Plaintiff had kicked an officer and called him a "cracker".

49.   Upon hearing Defendants Degner, Viton, and Mandara utter the false reports that Plaintiff had kicked an officer and called him a cracker, Defendant Lampitt stated to Defendants Degner, Viton, Carbonaro, Mandara, Liik, Sr., and out loud to other corrections officers in the area: "He kicked an officer and he called him a cracker?!... Take him down and fuck him up!!"

50.   Upon receiving a direct order from Defendant Lampitt, the supervising "Star Sergeant" of the Rotunda Area, to "take him down and fuck him up if, Defendants

13

Viton, Mandara, Degner, Degner, Carbonaro, Liik, Sr., and D'Amore used extreme and unnecessary physical force to remove Plaintiff from his subdued position where he was non-resistant and "pinned to" a wall and, with malicious intent, slam him with great force, chest-first, down onto the concrete floor, while he was handcuffed behind his back in metal handcuffs.

51.     After forcefully throwing Plaintiff to the concrete floor of the Rotunda, while he was handcuffed behind his back and offering no resistance, Defendants Viton, Mandara, Degner, D'Amore, Liik, Carbonaro, and Lampitt mounted Plaintiff and began pummeling him by striking him and choking him with batons, all while Plaintiff was face-down, defenseless, and handcuffed behind his back with metal handcuffs.

52.     While mounted upon Plaintiff Lewis, who was handcuffed. face-down, and defenseless, Defendants Viton, Mandara, Liik, Sr., Carbonaro, D'Amore, Degner, and Lampitt were physically assaulting and choking Plaintiff while referring to Plaintiff as "nigger", threatening to kill him, and admonishing him for allegedly uttering the word "cracker."

53.     Defendant Carbonaro was holding Plaintiff by his hair and head while he was mounted on Plaintiff back, as Plaintiff was lying facedown, handcuffed behind his back, restrained by multiple corrections officers, and did intentionally and knowingly lift and slam Plaintiff face and head repeatedly up and down into the concrete floor with great force and malice, causing Plaintiff right upper eyelid to rip wide open, while shouting to him to die and referring to him repeatedly as "nigger".

54.     Plaintiff, while lying face-down, handcuffed behind his back, and being mounted, choked, and beaten by Defendants Viton, Mandara, Degner, Carbonaro, D'Amore, Lampitt, and Liik, Sr., did observe Defendant Liik, Sr. repeatedly punching him in his face with short close-quarter punches and could not do anything to defend against or evade these strikes.

55.     Plaintiff, while lying face-down, handcuffed behind his back, being choked with a baton, mounted and being beaten by Defendants Viton, Mandara, Degner, Carbonaro, D' Amore , Liik, Sr., and Lampitt, did experience the afore-named defendants pin his head, neck, and upper chest to the ground, as they purposely and forcefully lifted his lower extremities in an upward and vertical position - hyperextending his spine against its natural curvature and range of motion - to intentionally and maliciously cause all of Plaintiff weight upon his neck and upper chest to effectively obstruct his airway, strangle him, and sadistically cause him unnecessary and excruciating pain and injury.

56.     As a result of the beating and strangulation of Plaintiff by Defendants Viton,

14

Mandara, Carbonaro, D' Amore, Degner, Liik, Sr., and Lampitt, as the afore-named defendants held Plaintiff lower extremities vertical to the ground in an effort to intentionally cause him unnecessary pain, discomfort, injury, strangulation, and terror, Plaintiff was bleeding profusely, gasping for air, shaking, and uncontrollably urinating upon himself.

57.  Defendants Viton, Handara, Carbonaro, D'Amore, Degner, Liik, Sr., and Lampitt did intentionally and maliciously apply leg-shackles to the lower extremities of Plaintiff with such force and tightness that they cut off his blood circulation, immobilized the bones in his legs, and tore deep lacerations into his legs, causing unnecessary and excruciating pain and suffering.

58.  Plaintiff was subjected to further unnecessary physical force, taunts and threats as he was roughly escorted, man-handled, and dragged from the Rotunda Area en route to the prison's clinic to receive medical attention for the injuries he sustained as a result of the malicious assault that was perpetrated against him by Defendants Viton, Mandara, Degner,  Carbonaro, D' Amore, Liik, Sr., and Lampitt while he was handcuffed behind his back in metal handcuffs, restrained by multiple corrections officers, and non-resistant.

59.  Upon arriving in the clinic's trauma room, Plaintiff was thrown face-down on a gurney as at least one corrections officer stood behind Plaintiff forcibly choking him with a baton that was being held and pulled upwards and backwards by the corrections officer standing behind him.

60.  Defendant Alaimo entered into the clinic trauma room and repeatedly struck Plaintiff about the face and head while Plaintiff was handcuffed behind his back and being held about the neck and throat by a baton held by another corrections officer and while openly stating to Plaintiff that he had told Plaintiff that they would get him again. (A clear reference to the events of  March 29, 2005 wherein Defendants Alaimo, Williams, Reagan, and Viton assaulted Plaintiff while he was handcuffed and restrained.

61.  Plaintiff heard several corrections officers who were also in the trauma room - including Defendants Carbonaro and Liik, Sr. - warn Defendant Alaimo to stop assaulting and threatening Plaintiff, as the nurse was about to enter the trauma room to examine him.

62.  Plaintiff lost conciousness while in the trauma room and when he regained conciousness he was seated in a chair, still handcuffed behind his back, in leg-shackles, and had his head being held up by a corrections officer standing behind him pulling a baton upwards and back into his throat to stabilize his head.

15

63.     Defendant Carbonaro was observed in the trauma room by Plaintiff bragging and
        demonstrating to his comrade corrections officers - including Defendants Alaimo and
        Liik, Sr. - about how he'd repeatedly slammed Plaintiff head into the concrete floor
        while calling him a "nigger" and daring Plaintiff to ever call someone "cracker"
        again. Defendant Carbonaro was also observed by Plaintiff at this time conveying to
        the other corrections officers present how he "wanted to see the nigger's brains on the
        floor".

64.     Plaintiff observed Defendants Alaimo, Carbonaro, Liik, Sr., and other corrections
        officers in the trauma room area "hi-fiving" (congratulatory hand-slapping gestures)
        after hearing Defendant Carbonaro's comments on what he had done to assault and
        injure Plaintiff and his thoughts concerning Lewis' race.

65.     Defendant Liik, Sr. was observed in the trauma room by Plaintiff explaining to
        Defendants Alaimo, Carbonaro, and other corrections officers how he must have
        scratched himself or scraped his arm on plaintiff's teeth when he was punching
        Plaintiff in his face or choking him through the pile.

66.     Defendant Liik, Sr. was heard by Plaintiff telling Defendants Alaimo and Carbonaro
        that his skin was not broken, but he hoped "that the nigger doesn't have A.I.D.S."

67.     Defendant Alaimo, upon hearing Defendant Liik, Sr. state that he scratched his arm
        while punching or choking Plaintiff, ordered Defendant Liik, Sr. to report that
        Plaintiff bit him.

68.     Defendant Liik, Sr., told Defendant Alaimo that Plaintiff did not bite him and that he
        was not going to report that he did.

69.     Upon hearing Defendant Liik, Sr. state that Plaintiff did not bite him and that he
        would not report such a thing, Defendant Alaimo gave Defendant Liik a direct order
        to write in his report that Plaintiff had bitten him and that Defendant Liik, Sr. was to
        report the same thing to the nurse.

70.     Defendant Liik again tried to inform Defendant Alaimo that Plaintiff had not bitten
        him and that he was not going to report such a thing, but was sternly admonished by
        Defendants Alaimo, Carbonaro, and other corrections officers present that he was
        going to report that Plaintiff had bitten him and Defendant Alaimo stated to
        Defendant Liik, Sr. that they'd get together later and that they'd (other veteran
        corrections officers) show him "how reports were written around here".

71.     Defendant Alaimo did without cause or provocation slap Plaintiff across the face and
        head while he was being held by another corrections officer with a baton across the

throat, after Defendant Alaimo made the statement to a corrections officer who had advised the other corrections officers in the trauma room that they should "just kill this motherfucker now and get it over with": "Naah, not here. Not with them around. Besides.. .we've chipped him up enough for today. We'll save some for next time."

72.   Plaintiff, though at times losing and regaining conciousness while in the trauma room, did specifically observe Defendant Alaimo trying desperately to coerce and intimidate the nurse attending to the medical needs of Plaintiff into not sending Plaintiff out to Saint Francis Medical Center and to instead just place Plaintiff into the prison's infirmiry until he heals up because Defendant Alaimo did not want outside agencies involved in the matter as Plaintiff would "tell".

73.   Nurse Sharon Lasko, notwithstanding her comments that she normally tries to cover for Defendant Alaimo and other corrections officers at the prison when they have injured or beaten a prisoner, did refuse Defendant Alaimo's attempts to coerce and intimidate her into not sending Plaintiff out by ambulance to Saint Francis Medical Center.

74.   As a result of the serious injuries that he sustained as a result of the malicious and sadistic handcuffed and shackled beating of him by Defendants Viton, Mandara, Degner, Carbonaro, D' Amore, Liik, Sr., Lampitt, and Alaimo, Plaintiff was transported by ambulance to the Saint Francis Medical Center on August 7, 2005 to receive emergency medical treatment.

75.   Prior to the events of March 29, 2005 and August 7, 2005, Defendant Cathel was personally notified of the threat to and had direct knowledge of the threat that was posed to Plaintiff by the defendants named herein and other correctional personnel at New Jersey State Prison and took absolutely no measures to protect Plaintiff or curb the pattern of lawlessness being effected upon Plaintiff by Defendant Cathel' s subordinates.

76.   Prior to the events of August 7, 2005, Defendant Brown was personally notified of the threat to and had direct knowledge of the threat that was posed to Plaintiff by the defendants named herein and other correctional personnel at New Jersey State Prison and took absolutely no measures to protect Plaintiff or curb the pattern of lawlessness being effected upon Plaintiff by Defendant Brown's subordinates.

B. Plaintiff intends to prove the following contested facts with regard to damages: (this must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages.)

17

1. As a result of the planned retaliatory assaults perpetrated against Plaintiff on March 29, 2005 in the New Jersey State Prison by Defendants Williams, Reagan, Viton, and Alaimo, while he was handcuffed to a leather waist-belt restraint device, in leg-shackles, and restrained by multiple corrections officers, Plaintiff did suffer lacerations to his lower extremities, lacerations to his wrists, and numerous lacerations, abrasions, and contusions to his face, head, and body.

2. As a result of the planned retaliatory assaults perpetrated against Plaintiff on March 29, 2005 in the New Jersey State Prison by Defendants Williams, Reagan, Viton, and Alaimo, while he was handcuffed to a leather waist-belt restraint device, in leg-shackles, and restrained by multiple corrections officers, Plaintiff does suffer from diminished range of motion in his wrists, his ankles, his hip, and his lumbar spine, and permanent pain and discomfort.

3. As a result of the planned retaliatory assaults perpetrated against Plaintiff on March 29, 2005 in the New Jersey State Prison by Defendants Williams, Reagan, Viton, and Alaimo, while he was handcuffed to a leather waist-belt restraint device, in shackles, and restrained by multiple corrections officers, Plaintiff does suffer from "night terrors", nightmares, anxiety, mood swings, chronic depression, and other adverse mental, emotional, and psychological conditions that are indicative of Post Traumatic Stress Disorder or similar disorders.

4. As a result of the malicious, sadistic, and retaliatory assaults perpetrated against Plaintiff on August 7, 2005 in the New Jersey State Prison by Defendants Viton, Mandara, Degner, Carbonaro, Liik, Sr., D' Amore, Lampitt, and Alaimo while he was handcuffed behind his back in metal handcuffs, in leg-shackles, and restrained by multiple corrections officers, Plaintiff did suffer lacerations to his lower extremities, lacerations to his wrists, and numerous lacerations, abrasions, and contusions to his face, head, and body.

5. As a result of the malicious, sadistic, and retaliatory assaults perpetrated against Plaintiff on August 7, 2005 in the New Jersey State Prison by Defendants Viton, Mandara, Degner, Carbonaro, Liik, Sr., D'Amore, Lampitt, and Alaimo, while he was handcuffed behind his back in metal handcuffs, in leg-shackles, and restrained by multiple corrections officers, Plaintiff does suffer from diminished range of motion in his wrists, his ankles, his hip, and his spine, and permanent pain and discomfort.

6. As a result of the malicious, sadistic, and retaliatory assaults perpetrated against Plaintiff on August 7, 2005 in the New Jersey State Prison by Defendants Viton, Mandara, Degner, Carbonaro, Liik, Sr., D'Amore, Lampitt, and Alaimo, while handcuffed behind his back in metal handcuffs, in leg-shackles, and restrained by

18

multiple corrections officers, Plaintiff Lewis does suffer from "night terrors", nightmares, anxiety, mood swings, chronic depression, and other adverse mental, emotional, and psychological conditions that are indicative of Post Traumatic Stress Disorder or similar disorders.

7.     As a result of the events of both March 29, 2005 and August 7, 2005 that caused Plaintiff to be rushed to the Saint Francis Medical Center to receive emergency medical attention for wounds and injuries that he received at the hands of Defendants Williams, Reagan, Viton, Alaimo, Mandara, Carbonaro, Degner, D'Amore, Liik, Sr., and Lampitt, Plaintiff has incurred permanent and disfiguring scarring on his face, right eyelid, wrists, and both lower extremities.

8.     Defendants Williams, Reagan, Viton, Alaimo, Mandara, Degner, Carbonaro, Liik, Sr., D'Amore, Lampitt, Cathel, and Brown did injure and cause damages to Plaintiff by subjecting him to cruel and unusual punishment and failing to protect him, in violation of the Eighth Amendment to the United States Constitution.

5.     **DEFENDANT'S CONTESTED FACTS:** (Stated separately for each plaintiff. See instructions above.)

A. Defendant intends to prove the following contested facts with regard to liability:

1.     On August 25, 2005, as SCO Paul Williams reached past Plaintiff in an attempt to shut the tier door after removing Plaintiff from his cell, Plaintiff bumped into the officer, spat on him and kicked him.

2.     In response, SCO Leroy Scott immediately sounded an institutional code for fighting (Code 33).

3.____COR Regan and SCO Viton, along with SCOs Williams and Scott took Plaintiff to the floor in an effort to restrain him.

4.     At that point, following the procedure for officers who have had physical contact with an inmate, SCO Williams was separated from the incident.

5.____Plaintiff continued to be combative, kicking violently.

6.     Plaintiff was  finally secured with leg irons and a restraint belt.

19

7.     Plaintiff was escorted to the infirmary to be medically cleared for placement in pre-hearing detention pending the outcome of disciplinary charges.

8.     Plaintiff was evaluated and it was noted that he sustained minor abrasions to the head area and some mild wrist pain.

9.     There were no signs of fracture or need for sutures.

10.     Following his examination by the medical staff, Plaintiff was escorted to 1-Left Housing Unit and placed in pre-hearing detention.

11.     Following the altercation with Plaintiff, SCO Williams was examined by the medical staff and it was determined that he sustained a slight sprain to his hand.

12.     Because Plaintiff spit on him, SCO Williams was sent to a private medical treatment facility for further treatment and evaluation and it was determined that no expectorant found its way into SCO Williams eyes or any other entry path so a prophylactic AIDS prescription was deemed unnecessary.

13.     Following treatment, SCO Williams returned to work that same day, and required no sick time as a result of the injuries sustained in the incident with Plaintiff.

14.     Plaintiff filed an administrative appeal of those disciplinary charges, which were upheld on appeal.

15.     On March 30, 2005, Special Investigations Division ("SID") Investigator ("Inv.") Maginnis interviewed Plaintiff about the March 29, 2005 incident.

16.     Plaintiff alleged that prior to this incident, SCO Williams was constantly harassing him by prohibiting him from going to the infirmary for his insulin injection during the first shift and by throwing away his orthopedic boots.

17.     Plaintiff also claimed that while the two escorting officers were holding him in a restraining belt, SCO Williams verbally threatened him and punched him in the face.

18.     Plaintiff made no other statements.

19.     Inv. Maginnis interviewed SCO Scott who had observed the altercation and sounded the code 33 and stated that he was unable to describe any verbal exchange between SCO Williams and Plaintiff because he was out of earshot.

20.     SCO Scott later contacted the NJSP Center Keeper to advise him of the situation.

20

21. Inv. Magnnis noted that Scott's version of the event matched the videotape recording of the incident.

22. On April 18, 2005, Inv. Maginnis interviewed SCO Viton regarding the incident.

23. Viton had observed Plaintiff and SCO Williams exchange words as Plaintiff came off the tier.

24. Viton stated that he did not observe Plaintiff spit on Williams as he was attempting to secure the restraint belt at that time, however, Viton clearly observed Plaintiff's "karate kick."

25. Viton acknowledged that he took Plaintiff to the floor with a baton strike to the right thigh and Viton did not hear any hostile verbal remarks directed towards Plaintiff prior to the assault.

26. Viton stated that SCO Williams asked Plaintiff to move so that the tier door could be shut, but noted that the request was handled with proper professional decorum.

27. On May 23, 2005, Inv. Maginnis interviewed COR Regan.

28. COR Regan stated that his observations were limited because he was attempting to secure Plaintiff's restraint belt at the time the incident took place.

29. COR Regan did not hear SCO Williams make a hostile remark directed at Plaintiff prior to the incident nor did he observe Plaintiff spit on or bump SCO Williams, however, COR Regan observed Plaintiff kick SCO Williams.

30. COR Regan stated that Plaintiff was very hostile and combative and thereby significant effort was required to control Plaintiff and that he assisted in bringing Plaintiff under control.

31. On April 18, 2005, Inv. Maginnis interviewed SCO Ptazenski who also responded to the Code 33.

32. In responding to the code, SCO Ptazenski held Plaintiff's legs so that leg irons could be applied, and assisted in securing the restraint belt on Plaintiff.  Id.

33. On May 12, 2005, Inv. Maginnis interviewed SCO Kevin Harrison who also responded to the Code 33.

34. After Plaintiff was secured, SCO Harrison assisted in Plaintiff's escort to the

infirmary and then to a holding cell and witnessed no use of excessive force throughout the incident, and that in direct opposition to claims made by Plaintiff, no force was used during Plaintiff's escort to the infirmary.

35.   Inv. Maginnis interviewed SCO Williams on May 13, 2005.

36.   SCO Williams denied threatening Plaintiff and denied using excessive force when Plaintiff was subdued after the assault.

37.   SCO Williams stated he suffered a slight hand sprain and that the Plaintiff spit in his face.

38.____On June 2, 2005, Inv. Maginnis interviewed Sergeant Stephen Alaimo.

39.   Sergeant Alaimo stated that no physical abuse of Plaintiff occurred either during, before or after the incident and Sergeant Alaimo noted that Plaintiff is consistently difficult for custody staff to deal with because of his verbal abuse.

40.____On June 3, 2005, Inv. Maginnis interviewed SCO Gerdes who escorted Plaintiff to the infirmary following the incident and he noted that there was no improper treatment of Plaintiff during the escort.

41.   On June 8, 2006, Inv. Maginnis completed a written report detailing Plaintiff's allegations with regard to the incident on March 29, 2005, and concluded that Plaintiff assaulted SCO Williams on the date in question.

42.   Furthermore, he concluded that a medical examination by both Correctional Medical Services and SFMC staff, the videotape of the event and testimony from participating correctional officers did not support Plaintiff's testimony of the altercation.

43.____Inv. Maginnis concluded that Plaintiff's claims of mistreatment, excessive use of force and prevention of proper medical treatment were without merit.

44.____On August 7, 2005, at approximately 6:46 a.m., SCOs Viton and Mandara were escorting the Plaintiff from housing unit 1-Left to the medical unit for his daily insulin shot and as SCOs Viton and Mandara escorted the Plaintiff through the West Compound rotunda area, Plaintiff turned toward SCO Anthony Degner in a threatening way and stated that he was going to "kill him."

45.   Plaintiff then made an aggressive move towards SCO Degner causing SCOs Viton and Mandara to immediately place him up against the wall to stop his forward motion towards SCO Degner.

46.____ Plaintiff continued to resist SCOs Viton and Mandara by becoming more combative and attempted to kick them as they restrained him against the wall.

47.    SCOs Viton and Mandara were then ordered by Sergeant Lampitt to take Plaintiff down to the floor to restrain him.

48.____ Upon seeing SCOs Viton and Mandara struggling with Plaintiff, SCOs Degner, Liik and Carbonaro assisted in restraining him once he was brought down to the ground.

49.    As a result of the struggle with the Plaintiff, SCO Viton suffered a small laceration on his left-hand index finger and was taken to RWJH for medical evaluation and treatment; SCO Mandara suffered multiple abrasions on his left arm and was seen by the medical unit for evaluation and treatment; SCO Liik suffered back injuries and was bitten by Plaintiff during the altercation and was taken to RWJH for medical evaluation and treatment; and SCO Carbonaro injured his right wrist as a result of the altercation and was also taken to RWJH for medical evaluation and treatment.

50.    Plaintiff was taken to SFMC for treatment of minor lacerations and contusions.

51.    On August 8, 2005, SID Sr. Inv. Butler attempted to interview Plaintiff about the August 7, 2005, incident, however, Plaintiff stated to the escorting officers that he refused to be escorted to the interview room because he did not want to talk to anyone from SID.

52.____ On September 15, 2005, Sr. Invs. Butler and Robbins made a second attempt to interview the Plaintiff concerning the August 7, 2005, incident, and again Plaintiff told the escorting officers that he did not want to be interviewed by SID and refused to be escorted to the interview room.

53.    Sr.Inv. Robbins then proceeded to detention unit 1-Left to again attempt to interview Plaintiff wherein he agreed to be interviewed after Sr. Inv. Robbins advised him of his rights in accordance with Miranda.

54.    Plaintiff alleged that while he was on medical escort to the medical unit an officer suddenly and unexpectedly assaulted him from behind.

55.    When asked if he knew the name of the officer who had assaulted him the Plaintiff stated it was SCO Liik.

56.    When was asked how he knew it was this particular officer, Plaintiff advised Sr. Inv. Robbins that SCO Liik had him by the neck at the bottom of the pile of officers who had taken him down to the ground.

57.    When Plaintiff was asked to explain who he thought wanted to harm him, he stated that he had nothing further to say and the interview was concluded.

58.    Sr. Inv. Butler interviewed SCO Viton on September 12, 2005, at which time SCO Viton stated that on August 7, 2005, he and SCO Mandara were escorting Plaintiff from detention unit 1-Left to the medical unit for his insulin shot.

59.    He further stated that as they passed through the rotunda area, Plaintiff threatened SCO Degner stating, "I'll kill you cracker," he then stopped walking and turned towards SCO Degner.

60.    SCO Viton then immediately ordered Plaintiff continue walking at which time Plaintiff refused by saying "no."

61.    SCO Viton advised Sr. Inv. Butler that he then proceeded to grab Plaintiff's arm in an attempt to proceed with the escort but Plaintiff aggressively turned towards SCO Degner.

62.    In response to Plaintiff's aggression, SCO Viton and SCO Mandara then pushed Plaintiff up against the wall in an effort to control him, however, Plaintiff continue to struggle and became more combative by kicking at SCOs Viton and Mandara.

63.    They were then ordered by Sergeant Lampitt to take Plaintiff down to the floor to secure him.

64.    SCO Viton stated that during the struggle he suffered a cut on his left-hand index finger.

65.    On September 12, 2005, Sr. Inv. Butler also interviewed SCO Mandara concerning the August 7, 2005, incident.

66.    SCO Mandara related that he and SCO Viton were escorting Plaintiff from detention unit 1-Left to the medical unit for his insulin shot and as they passed through the rotunda area, Plaintiff threatened SCO Degner stating, "get out of my way cracker or I'm going to kill you."

67.    SCO Mandara related that Plaintiff turned aggressively towards SCO Degner and had to be restrained up against the wall to prevent him from approaching SCO Degner.

68.    SCO Mandara stated that Sergeant Lampitt ordered them to take the him down to the floor to control him.

69.   During the struggle, SCO Mandara related to Sr. Inv. Butler that he suffered multiple abrasions on his left arm as a result of Plaintiff resisting.

70.   On September 13, 2005, Sr. Inv. Butler interviewed SCO Anthony Degner concerning the August 7, 2005, incident wherein SCO Degner related that as he was passing through the rotunda area at the same time that Plaintiff was being escorted by SCOs Viton and Mandara, Plaintiff stated "get out of my way cracker."

71.   SCO Degner continued to walk away from Plaintiff when Plaintiff stated "I'm gonna kill you" and then tried to move towards him as SCOs Viton and Mandara attempted to control him by putting him up against the wall.

72.   SCO Degner stated that Plaintiff became more aggressive by kicking and twisting as he and other responding officers attempted to subdue him.

73.   SCO Degner stated he had no prior problems with Plaintiff and that he did not know why Plaintiff would react this way towards him.

74.   On September 26, 2005, Sr. Inv. Butler interviewed Sergeant Lampitt concerning the August 7, 2005, incident and Sergeant Lampitt advised that he was on duty as the rotunda supervisor when SCOs Mandara and Viton escorted Plaintiff through the rotunda area.

75.   As SCOs Viton, Mandara and Plaintiff passed SCO Degner, Plaintiff stated to SCO Degner that "he was going to kill him" and then turned towards SCO Degner and the escorting officers placed him up against the wall.

76.   As Plaintiff continued to resist, Sergeant Lampitt stated that he was compelled to order the escorting officers to take Plaintiff down to the floor in an attempt to control him.

77.   Sergeant Lampitt stated he called a code 33 emergency and responding officers assisted in subduing Plaintiff.

78.   Sergeant Lampitt advised Sr. Inv. Butler that SCO Liik, who assisted in subduing Plaintiff, reported that Plaintiff had bit him on the arm during the altercation.

79.   On September 27, 2005, Sr. Inv. Butler interviewed SCO Liik, concerning the August 7, 2005, incident wherein SCO Liik related that he was in the rotunda area when Plaintiff was being escorted to the medical unit.

80.   SCO Liik stated that he assisted the escorting officers in subduing Plaintiff who was

25

aggressively resisting their efforts to control him and that during the incident Plaintiff bit him on the left forearm.

81.   SCO Liik did not know what caused this incident or know of any problems between SCO Degner and Plaintiff.

82.   On September 29, 2005, Sr. Inv. Butler interviewed SCO Carbonaro concerning the August 7, 2005, incident wherein SCO Carbonaro stated he observed Plaintiff being physically and verbally combative with the escorting officers.

83.   SCO Carbonaro stated he assisted in restraining Plaintiff by holding his head stationary to prevent him from biting other officers.

84.   SCO Carbonaro did not observe Plaintiff biting staff, however, he heard someone say during the struggle to restrain him that they were "bitten on the arm.

B. Defendant intends to prove the following contested facts with regard to damages: (This statement must include the factual basis for each defense against plaintiff's claims for damages.)

1.   That the officers acted with appropriate force in restraining Plaintiff on both the March 29, 2005 and the August 7, 2005 incidents.

2.   That an injuries suffered by Plaintiff were as a result of his actions of attacking correctional staff and resisting being subdued by staff.

3.   That Plaintiff has not provided any expert report to sustain his claims of permanent injuries.

6.   **PLAINTIFF'S WITNESSES:** (Aside from those called for impeachment purposes, only the witnesses whose names and addresses are listed below will be permitted to testify at trial.)

A.   On liability Plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

1.   Mr. John Roney (Address withheld at this time because Plaintiff feels that witness' safety will be jeopardized if Defendants know how to locate the witness. Will provide to the Court, as ex parte communication.)

Witness will be summoned to testify that he repeatedly contacted the Administration

26

of the New Jersey State Prison and the Commissioner of the New Jersey Department of Corrections and notified them of the abuses that Plaintiff was being subjected to between the dates of March 11, 2005 through September 14, 2005.

2.     Ms. Sandra Lewis (Address withheld at this time because Plaintiff feels that witness' safety will be jeopardized if the Defendants know how to locate the witness. Will provide to the Court, as ex parte communication.)

Witness will be summoned to testify that she repeatedly contacted the Administration of the New Jersey State Prison and the Commissioner of the New Jersey Department of Corrections and notified them of the abuses that Plaintiff was being subjected to between the dates of March 11, 2005 through September 14, 2005.

3.     Assemblyman Jerry Green will be summoned to appear to testify that he contacted Defendant Devon Brown and notified him of the abuses and rights violations that Plaintiff was suffering at the New Jersey State Prison.

B.     On damages plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

Plaintiff has not provided the names of any witnesses to testify as to damages.

a.     Defendants object to the testimony of John Roney and Sandra Lewis as they are not being produced to testify about the facts alleged in Plaintiff's complaint or the incident which is the subject matter of this litigation.

b.     Defendants objects to the testimony of any witness whose testimony is based solely on hearsay information.

7.     **DEFENDANT'S WITNESSES:** (See instruction above)

A. On liability defendant intends to call the following witnesses who will testify in accordance with the following summaries:

Paul Williams
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

27

Lazaro Viton
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

James Regan
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

Stephen Alaimo
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

Ronald Cathel
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

Giuseppe Mandara
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

28

James Liik, Sr.,

New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

Phillip Lampitt
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

Anthony Degner
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

Stephen Alaimo
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

Gregory Carbonaro
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness is a defendant and has knowledge of the incident alleged in Plaintiff's Complaint and will testify about the incident as well as prison policies and procedures.

B. On damages defendant intends to call the following witnesses who will testify in accordance with the following summaries:

Nurse Sharon Lasko
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

This witness has knowledge of plaintiff's medical treatment and physical condition.

C. Plaintiff objects to the following witnesses for the reasons stated:

8.      **EXPERT WITNESSES:** (No expert shall be permitted to testify at Trial unless listed below and unless a summary of his qualifications and a copy of his report are attached hereto. Said summary shall be read into the record at the time he takes the stand, and no opposing counsel shall be permitted to question his expert qualifications unless the basis of objection is set forth herein.)

A. Plaintiff has not provided the name of any expert witness.

B. Defendant's objections to the qualifications of plaintiff's experts are:

As defendant has named no expert, Defendant cannot at this time making any objection.

C. Defendant's expert witnesses are:

The defendants will not be presenting an expert witness.

D. Plaintiff's objections to the qualifications of defendant's experts are:

9.    **PLAINTIFF'S DEPOSITIONS:** (List, by page and line, all deposition testimony to be offered into evidence. All irrelevant and redundant matters and all colloquy between counsel must be eliminate, unless ruled relevant. Deposition testimony to be used solely for impeachment purposes need not be listed.)

Plaintiff has provided no indication that he intends to use any depositions at the time of trial.

10.    **DEFENDANT'S DEPOSITIONS:** (See instructions above.)

A. On liability defendant intends to read into evidence the following:

Defendants do not intend to read into evidence the depositions of any witness on  liability, except to impeach or refresh recollection. Defendants reserve the right to read deposition testimony due to unforeseen events at time of trial.

B. On damages defendant intends to read into evidence the following:

Defendants do not intend to read into evidence the depositions of any witness on damages, except to impeach or refresh recollection. Defendants reserve the right to read deposition testimony due to unforeseen events at time of trial.

C. Plaintiff objects to the deposition testimony set forth above for the reasons stated:

11.    **PLAINTIFF'S EXHIBITS:** (Except for exhibits, the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at the Trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made.) : See Attached list

12.    **DEFENDANT'S EXHIBIT** (See instructions above.)

A. Defendant intends to introduce into evidence the exhibits listed on the attached exhibit list (List by number with a description of each exhibit):

1.    Plaintiff's face sheet and progress notes

2.    Investigation reports for incident on March 29, 2005.

3.      Video of incident on March 29, 2005.

4.      Disciplinary report for incident on March 29, 2005.

5.      Adjudication report with exhibits for incident on March 29, 2005.

6.      Administrative appeal for the incident on March 29, 2005.

7.      Disposition of administrative appeal for the incident on March 29, 2005.

8.      Special Investigation Division report for the incident on March 29, 2005.

9.      Investigation reports for incident on August 7, 2005.

10.     Disciplinary report for incident on August 7, 2005.

11.     Adjudication report with exhibits for incident on August 7, 2005.

12.     Administrative appeal for the incident on August 7, 2005.

13.     Disposition of administrative appeal for the incident on August 7, 2005.

14.     Special Investigation Division report for the incident on August 7, 2005.

15.     Plaintiff's electronic medical records.

16.     Inmate remedy forms submitted by Plaintiff between March 2005 and September 2005.

B. Plaintiff objects to the introduction of defendant's exhibits (set forth number of exhibit and grounds for objection):

(COPIES OF EXHIBITS ARE TO BE MADE FOR OPPOSING COUNSEL, AND A BENCH BOOK OF EXHIBITS IS TO BE DELIVERED TO THE JUDGE AT THE START OF TRIAL.  IF COUNSEL DESIRES TO DISPLAY EXHIBITS TO THE JURY, SUFFICIENT COPIES SHOULD BE AVAILABLE TO PROVIDE EACH JUROR WITH A COPY; ALTERNATIVELY, ENLARGED PHOTOGRAPHIC OR PROJECTED COPIES MAY BE USED.)

13.     **PLAINTIFF'S LEGAL ISSUES:**

32

A)    Determine that the force used upon Plaintiff while he was handcuffed and restrained, on March 29, 2005 in the New Jersey State Prison by Defendants Paul Williams, James Reagan, and Lazaro Viton was a orchestrated retaliatory assault upon Plaintiff Andre' Lewis to maliciously and sadistically punish and inflict pain, suffering, terror, and injury upon him for filing complaints and grievances against Defendant Paul Williams and other corrections officers at New Jersey State Prison.

B)    Determine that the force used upon Plaintiff, while he was handcuffed and restrained, on March 29, 2005in the New Jersey State Prison by Defendants Paul Williams, James Reagan, and Lazaro Viton was not effected in "good faith", served no legitimate penological interest, and was not objectively reasonable, as no law enforcement officer, or even civillian, would use such force on a human being that was handcuffed, in leg-shackles, and restrained at all times by multiple corrections officers.

C)    Determine that Defendant Paul Williams did initiate and cause the events of March 29, 2005 by intentionally, and without provocation or cause, striking Plaintiff in the face while Plaintiff was handcuffed and being held in place by Defendant James Reagan.

D)    Determine that any actions effected by Plaintiff after he was struck in the face by Defendant Paul Williams were purely instinctive, natural, and defensive in nature, and only effected to protect himself from the assault being perpetrated upon him, while he was handcuffed and restrained, by Defendants Paul Williams, James Reagan, and Lazaro Viton.

E)    Determine that Defendant Stephen Alaimo did repeatedly strike Plaintiff Andre' Lewis about the head and face, and threaten him, while he was handcuffed, in leg-shackles, and held at all times by two other corrections officers, while Plaintiff was in a corridor that had no camera surveillance equipment.

F)    Determine that as a result of the planned retaliatory assaults on Plaintiff, effected by Defendants Paul Williams, James Reagan, Lazaro Viton, and Stephen Alaimo, Plaintiff Andre' Lewis was taken by ambulance to Saint Francis Medical Center to receive emergent medical to the wounds and injuries he sustained during the events of March 29, 2005 at the hands of the afore-named defendants.

G)    Determine that Defendants Paul Williams, James Reagan, Lazaro Viton, and Stephen Alaimo did purposely and knowing conspire to create and submit false disciplinary charges and reports against Plaintiff and tamper with evidence in an effort to "set him up" and "cover up" and justify the assaults that they planned and effected upon

33

Plaintiff on March 29, 2005.

H)    Determine that as a direct result of the unnecessary malicious and sadistic force used upon Plaintiff, while he was handcuffed and restrained, on March 29, 2005 in the New Jersey State Prison by Defendants Paul Williams, James Reagan, Lazaro Viton, and Stephen Alaimo, Plaintiff Lewis has sustained permanent and debilitating physical injury, permanent scarring and disfigurement, and suffers from mental pain and suffering.

I)    Determine that the video tape evidence that captured portions of the events of March 29, 2005 that caused this civil action to be brought were purposely and criminally tampered with by the defendants named herein and/or their colleagues in the New Jersey Department of Corrections.

J)    Determine that the force used upon Plaintiff, while he was handcuffed, in leg-shackles, and restrained by multiple corrections officers in the New Jersey State Prison on August 7, 2005, by Defendants Lazaro Viton, Guiseppe Mandara, Anthony Degner, Gregory Carbonaro, James Liik. Sr., D'Amore, P. Lampitt, and Stephen Alaimo was malicious, sadistic, and effected against Plaintiff to retaliate against him for filing grievances and complaints against corrections officers and the conditions of his confinement, to terrorize him, to deter him from filing future complaints and grievances against corrections officers, and to cause him pain, suffering and bodily injury.

K)    Determine that the force used against Plaintiff by Defendants Lazaro Viton, Guiseppe Mandara, Anthony Degner, Gregory Carbonaro, James liik, Sr., D'Amore, P. Lampitt, and Stephen Alaimo while he was handcuffed, in leg-shackles, and restrained by multiple corrections officers was purposely malicious, sadistic, retaliatory, acted out in "bad faith", and served no legitimate penological interest.

L)    Determine that the force used against Plaintiff, by Def endan ts Lazaro Viton, Guiseppe Mandara, Anthony Degner, Gregory Carbonaro, James Liik, Sr., D'Amore, P. Lampitt, and Stephen Alaimo was not objectively reasonable and that no reasonable law enforcement officer, or even civillian, would have used such force on a human being that was handcuffed, in leg-shackles, and restrained by multiple corrections officers.

M)    Determine that as a result of the malicious and sadistic force used against Plaintiff, by Defendants Lazaro Viton, Guiseppe Handara, Anthony Degner, Gregory Carbonaro, James Liik, Sr., D' Amore, P. Lampitt, and Stephen Alaimo, on August 7, 2005 in the New Jersey State Prison, Plaintiff was transported to Saint Francis Medical Center by ambulance to receive emergent medical treatment for the serious

injuries that he received after being assaulted while handcuffed, in leg-shackles, and held by multiple corrections officers, by the afore-named defendants.

N)   Determine that as a result of the force used against Plaintiff, while he was handcuffed, in leg-shackles, and restrained by multiple corrections officers, on August 7, 2005 in the New Jersey State Prison, by Defendants Lazaro Viton, Guiseppe Mandara, Anthony Degner, Gregory Carbonaro, James Liik, Sr., D'Amore, P. Lampitt, and Stephen Alaimo, Plaintiff has incurred physical injuries that have left him with permanent pain in his back, neck, legs, and wrists; loss of range of motion in his back, legs, neck, and wrists; permanent scarring and disfigurement to his legs, wrists, and face; and psychological and emotional pain and suffering.

O)   Determine that Defendants Lazaro Viton, Guiseppe Mandara, Anthony Degner, Gregory Carbonaro, James Liik, Sr., D' Amore, P. Lampi t t, and Stephen Alaimo did knowingly and purposely conspire to file false reports and disciplinary charges against Plaintiff in a collusive effort to "set him up", justify the force that they effected' upon him, and to cover up the fact that the assaults that they effected upon him on August 7, 2005 in the New Jersey State Prison were not committed in "good faith", but to retaliate against Plaintiff for filing grievances and complaints against corrections officers; to terrorize him into never filing such grievances again; and to cause him punishment, pain, and mental anguish.

P)   Determine that on March 29, 2005, Defendants Paul Williams, James Reagan, Lazaro Viton, and Stephen Alaimo did maliciously and sadistically assault and batter Plaintiff in violation of the laws of the State of New Jersey, while acting under color of state law.

Q)   Determine that on August 7, 2005, Defendants Lazaro Viton, Guiseppe Nandara, Anthony Degner, Gregory Carbonaro, James Liik, Sr., D'Amore, P. Lampitt, and Stephen Alaimo did maliciously and sadistically assault and bat ter Plaintiff in violation of the laws of the State of New Jersey, while acting under color of state law.

R)   Determine that the video tape evidence that captured portions of the event of August 7, 2005 has been purposely and criminally tampered with by Defendants Lazaro Viton, Guiseppe Mandara, Anthony Degner, Gregory Carbonaro, James Liik, Sr., D'Amore, P. Lampitt, and Stephen Alaimo and/or their colleagues at the New Jersey Department of Corrections.

S)   Determine that Defendant Ronald Cathel was notified of and had knowledge of the abuses that were being effected upon Plaintiff and the threat posed to his well being and life while being housed in the New Jersey State Prison throughout the dates of March 11, 2005 through September 14, 2005 and took no action or measures to

protect Plaintiff or curb the pattern of violence and abuse being effected upon Plaintiff.

T)     Determine that Defendant Devon Brown was notified of and had knowledge of the abuses that were being effected upon Plaintiff and the threat posed to his well-being and life while being housed in the New Jersey State Prison throughout the dates of March 29, 2005 through September 14, 2005 and took no action or measures to protect Plaintiff or curb the pattern of violence and abuse being effected upon Plaintiff.

U)     Determine that the actions of Defendants Paul Williams, James Reagan, Lazaro Vi ton, Guiseppe Mandara, Anthony Degner, Gregory Carbonaro, James Liik, Sr., D' Amore, P. Lampitt, Stephen Alaimo, Ronald Cathel, and Devon Brown on March 29, 2005 and August 7, 2005, respectively, did violate Plaintiff rights under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment and excessive force.

V)     Determine that the actions of Defendants Paul Williams, James Reagan, Lazaro Viton, Guiseppe Mandara, Anthony Degner, Gregory Carbonaro, James Liik, Sr., D'Amore, P. Lampitt, and Stephen Alaimo on March 29, 2005 and August 7, 2005, respectively, did violate Plaintiff rights under the First Amendment to the United States Constitution to have Freedom of Speech and to file grievances and seek redress for adverse conditions affecting him.

W)     Determine that Plaintiff is entitled to compensatory damages from all named-defendants.

X)     Determine that Plaintiff is entitled to punitive damages from all named -defendants.

Y)     Determine that Plaintiff is entitled to any other relief that the Court may deem that he is entitled to.

14.     **DEFENDANTS' LEGAL ISSUES:**

A)     Whether plaintiff's claims as to defendants Cathel and Brown are barred under the theory of respondeat superior.

B)     Whether defendants violated plaintiff's Eighth Amendment rights.

C)     Whether defendants violated plaintiff's First Amendment rights.

36

D)    Whether defendants used excessive force against plaintiff.

E)    Whether defendants were deliberately indifferent to plaintiff's medical needs.

F)    Whether plaintiff suffered any physical or mental injuries, permanent or otherwise

G)    Whether plaintiff's injuries, if any, were caused by defendants' actions.

H)    Whether plaintiff may prove his injury claims with lay opinion testimony.

I)    Whether plaintiff may prove causation of his injury claims without an expert.

J)    Whether defendants are entitled to qualified immunity.

K)    Whether plaintiff is entitled to declaratory judgment.

L)    Whether plaintiff is entitled to punitive damages.

M)    Whether plaintiff is entitled to compensatory damages.


15.    **MISCELLANEOUS**

Set forth any other matters which require action by, or should be brought to the attention of the Court.

(A)    Can plaintiff bare the burden of being Pro Se in two federal cases that are in Court during full litigation without any counsel support.  Plaintiff does not have the skill to proceed to trial Pro Se.


16.    **JURY TRIALS:**

Not later than: *fourteen (14) days prior to trial.*

A. Each party shall submit to the District Judge and to opposing counsel, a Trial Brief or memorandum in accordance with General Rule 27, with citations to authorities cited and

37

arguments in support of its position on all disputed issues of law.  In the event a brief is not filed, the delinquent party's complaint or defense may be stricken.

B. Counsel for each party shall submit to the Judge with a copy to opposing counsel, written requests for instructions to the jury.  Supplemental requests for instructions may be submitted at any time prior to argument to the jury.  All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations of supporting authorities, if any, and shall designate the party submitting same.  In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper.

C.  If any hypothetical question to be put to an expert witness on direct examination, these shall be submitted to the Judge and opposing counsel.

D.  Counsel shall submit to the Judge, with a copy to opposing counsel, their proposed voir dire, if any.

17.   **NON-JURY TRIALS**

Not later than: _____

A.  Each party shall submit to the District Judge and to opposing counsel, a Trial Brief or memorandum in accordance with General Rule 27, with citations to authorities cited and arguments in support of its position on all disputed issues of law.  In the event a brief is not filed, the delinquent party's complaint or defense may be stricken.

B.  Each side shall submit to the Judge and other counsel proposed written findings of fact and conclusions of law.  There is reserved to counsel the right to submit additional proposed findings of fact and conclusions of law during the course of the trial on those matters that cannot reasonably be anticipated.

C.  If any hypothetical question to be put to an expert witness on direct examination, these shall be submitted to the Judge and opposing counsel.

18.   **TRIAL COUNSEL** (List the names of trial counsel for all parties)

Joseph M. Micheletti
Deputy Attorney General
Attorney for Defendants

38

19.  **BIFURCATION:** (Where appropriate, the issues relating to liability shall be severed and tried to verdict.  Thereafter, all issues relating to damages issues will be tried.

The issue of liability and damages  SHALL / SHALL NOT be tried separately.

20.  **ESTIMATED LENGTH OF TRIAL:**

_____3_____ days for liability   and  _____1_____ days for damages.


AMENDMENTS TO THIS PRETRIAL ORDER SHALL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED.  THE COURT MAY, FROM TIME TO TIME, SCHEDULE CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE REQUEST OF COUNSEL.

_____

Andre' Lewis
Plaintiff, Pro se

s/ *Joseph M. Micheletti*
_____

Joseph M. Micheletti
Attorney for Defendant

_____

DOUGLAS E. ARPERT
UNITED STATES MAGISTRATE JUDGE

DATED: 10/12/10

39